IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| I.P. o/b/o D.S., | ) |
|         Plaintiff, | ) |
| v. | ) No. |
| FOX HEALTH PLAN and<br>AETNA LIFE INSURANCE COMPANY, | ) |
|         Defendants. | ) |

## **COMPLAINT**

Now comes the Plaintiff, I.P., as the next friend on behalf of her minor son, D.S. ("Plaintiff"), by and through attorneys, MARIE E. CASCIARI, MARK D. DEBOFSKY, and DEBOFSKY, SHERMAN, & CASCIARI, P.C., and complaining against the Defendants, FOX HEALTH PLAN ("Plan") and AETNA LIFE INSURANCE COMPANY ("Aetna") (collectively "Defendants"), states as follows:

### **JURISDICTION**

1. Jurisdiction of this Court is based upon the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1001 *et seq.*), and in particular, ERISA §§ 502(e)(1) and (f) (29 U.S.C. §§ 1132(e)(1) and (f)). Those provisions give the district court jurisdiction to hear civil actions brought pursuant to ERISA § 502(a) (29 U.S.C. § 1132(a)), which, in this case, involves a self-funded group health plan, the Plan, administered by Aetna for the benefit of Fox Entertainment Group, Inc. ("Fox Entertainment") employees and their dependents.

2. This action may also be brought before the district court pursuant to 28 U.S.C. § 1331, which provides subject matter jurisdiction over actions that arise under the laws of the United States.

3.  The ERISA statute provides, at ERISA § 503 (29 U.S.C. § 1133), a mechanism for internal appeals of adverse benefit determinations. Those avenues of appeal have been exhausted.

## VENUE

4.  Venue is proper in the Northern District of Illinois, Eastern Division pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because Plaintiff resides in this District.

5.  Venue is also proper in the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

## NATURE OF ACTION

6.  This action is brought as a claim for healthcare benefits under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) and for breach of fiduciary duty under ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)). Plaintiff also seeks reimbursement of his reasonable attorneys' fees and costs pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g)).

## PARTIES

7.  At all times relevant hereto, Plaintiff, who is currently age 16, but was age 14 when he began to incur the mental health treatment at issue here, was a resident of Chicago, Illinois. Incident to Plaintiff's mother's employment with Fox Entertainment, and his status as his mother's dependent, Plaintiff received dependent health coverage under the Plan as a "beneficiary" as defined by ERISA § 3(8) (29 U.S.C. § 1002(8)).

8.  At all times relevant hereto, the Plan was sponsored by Fox Entertainment, employer identification number 95-4066193, and constituted an "employee welfare benefit plan" as defined by ERISA § 3(1) (29 U.S.C. § 1002(1)). Plaintiff seeks healthcare benefits due under

the Plan (a true and correct copy of which is attached hereto and incorporated herein by that reference as Exhibit "A").

9. At all times relevant hereto, Aetna was a fiduciary of the Plan because it was the claim administrator and exercised authority in administering the Plan. ERISA § 3(21)(A)) (29 U.S.C. § 1002(21)(A)). At all times relevant hereto, Aetna was also doing business within the Northern District of Illinois, Eastern Division.

## RELEVANT PLAN PROVISIONS

10. The provisions of the Plan applicable to Plaintiff's healthcare benefits claims provide as follows:

### How Your Medical Plan Works

**Understanding Precertification**

**Precertification**
Certain services, such as inpatient **stays**, certain tests, procedures and **outpatient** surgery require **precertification** by **Aetna**…

You do not need to **precertify** services provided by a **network provider**. **Network providers** will be responsible for obtaining necessary **precertification** for you. Since **precertification** is the provider's responsibility, there is no additional out-of-pocket cost to you as a result of a **network provider's** failure to **precertify** services.

When you go to an **out-of-network provider**, it is your responsibility to obtain precertification from Aetna for any services or supplies on the precertification list below. If you do not precertify, your benefits may be reduced, or the plan may not pay any benefits…

**Services and Supplies Which Require Precertification**
Precertification is required for the following types of medical expenses:

**Inpatient and Outpatient Care**…

- **Stays** in a **Residential Treatment Facility** for treatment of mental disorders and substance abuse…

**How Failure to Precertify Affects Your Benefits**

3

A **precertification** benefit reduction will be applied to the benefits paid if you fail to obtain a required **precertification** prior to incurring medical expenses. This means **Aetna** will reduce the amount paid towards your coverage, or your expenses may not be covered. You will be responsible for the unpaid balance of the bills.

You are responsible for obtaining the necessary **precertification** from **Aetna** prior to receiving services from an **out-of-network provider**. Your provider may **precertify** your treatment for you; however you should verify with **Aetna** prior to the procedure, that the provider has obtained **precertification** from **Aetna**. If your treatment is not **precertified** by you or your provider, the benefit payable may be significantly reduced or your expenses may not be covered.

**How Your Benefits are Affected**
The chart below illustrates the effect on your benefits if necessary **precertification** is not obtained.

| If precertification is: | then the expenses are: |
|---|---|
| - requested and approved by Aetna. | - covered. |
| - requested and denied. | - not covered, may be appealed. |
| - not requested, but would have been covered if requested. | - covered after a **precertification** benefit reduction is applied.* |
| - not requested, would not have been covered if requested. | - not covered, may be appealed. |

It is important to remember that any additional out-of-pocket expenses incurred because your **precertification** requirement was not met will not count toward your deductible or payment percentage or maximum out-of-pocket limit.

*Refer to the *Schedule of Benefits* section for the amount of **precertification** benefit reduction that applies to your plan.

Ex. A, at 16-18.

## What The Plan Covers

**Treatment of Mental Disorders and Substance Abuse**

**Treatment of Mental Disorders**
**Covered expenses** include charges made for the treatment of **mental disorders** by **behavioral health providers**.

**Important Note**

4

> Not all types of services are covered. For example, educational services and certain types of therapies are not covered. See *Medical Plan Exclusions* for more information.
>
> In addition to meeting all other conditions for coverage, the treatment must meet the following criteria:
>
> - There is a written treatment plan supervised by a **physician** or licensed provider; and
> - The Plan is for a condition that can favorably be changed.
>
> Benefits are payable for charges incurred in a **hospital, psychiatric hospital, residential treatment facility** or **behavioral health provider's** office for the treatment of **mental disorders** as follows:
>
> **Inpatient Treatment**
> **Covered expenses** include charges for **room and board** at the **semi-private room rate,** and other services and supplies provided during your **stay** in a **hospital, psychiatric hospital** or **residential treatment facility**. Inpatient benefits are payable only if your condition requires services that are only available in an inpatient setting.
>
> **Important Reminder**
> Inpatient care, partial **hospitalizations** and outpatient treatment must be **precertified** by **Aetna**. Refer to *How the Plan Works* for more information about precertification.

Ex. A, at 46.

> **Medical Plan Exclusions**
>
> Not every medical service or supply is covered by the plan, even if prescribed, recommended, or approved by your **physician** or **dentist**. The plan covers only those services and supplies that are **medically necessary** and included in the *What the Plan Covers* section. Changes made for the following are not covered except to the extent listed under the *What the Plan Covers* section or by amendment attached to this Booklet…
>
> **Behavioral Health Services:**
>
> - Alcoholism or **substance abuse** rehabilitation treatment on an inpatient or outpatient basis, except to the extent coverage for **detoxification** or treatment of alcoholism or **substance abuse** if specifically provided in the *What the Medical Plan Covers* section.

- Treatment of a covered health care provider who specializes in the mental health care field and who receives treatment as a part of their training in that field.
- Treatment of impulse control disorders such as pathological gambling, kleptomania, pedophilia, caffeine or nicotine use.
- Treatment of antisocial personality disorder.
- Treatment of wilderness programs or other similar programs.
- Treatment of mental retardation, defects, and deficiencies. This exclusion does not apply to mental health services or to medical treatment of mentally retarded in accordance with the benefits provided in the *What the Plan Covers* section of this Booklet.

Ex. A, at 49.

11. The Plan defines the following relevant terms referenced and/or incorporated into the plan provisions cited above as follows:

**Behavioral Health Provider/Practitioner**
A licensed organization or professional providing diagnostic, therapeutic or psychological services for behavioral health conditions.

**Medically Necessary or Medical Necessity**
These are health care or dental services, and supplies or **prescription drugs** that a **physician**, other health care provider or **dental provider**, exercising prudent clinical judgment, would give to a patient for the purpose of:

- preventing;
- evaluating;
- diagnosing; or
- treating:
  - an **illness**;
  - an **injury**;
  - a disease; or
  - its symptoms.

The provision of the service, supply or **prescription drug** must be:

a) In accordance with generally accepted standards of medical or dental practice;
b) Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's **illness, injury** or disease; and
c) Not mostly for the convenience of the patient, **physician**, other health care or **dental provider**; and
d) And do not cost more than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results as to the diagnosis or treatment of that patient's **illness, injury** or disease.

6

For these purposes "generally accepted standards of medical or dental practice" means standards that are based on credible scientific evidence published in peer-reviewed literature. They must be generally recognized by the relevant medical or dental community. Otherwise, the standards are consistent with **physician** or dental specialty society recommendations. They must be consistent with the views of **physicians** and or **dentists** practicing in relevant clinical areas and any other relevant factors.

**Mental Disorder**
An **illness** commonly understood to be a **mental disorder**, whether or not it has a physiological basis, and for which treatment is generally provided by or under the direction of a **behavioral health provider** such as a **psychiatric physician**, a psychologist or a psychiatric social worker.

Any one of the following conditions is a **mental disorder** under this plan:

- Anorexia/Bulimia Nervosa.
- Bipolar disorder.
- Major depressive disorder.
- Obsessive compulsive disorder.
- Panic disorder.
- Pervasive developmental disorder (including Autism).
- Psychotic disorders/Delusional disorder.
- Schizo-affective disorder.
- Schizophrenia.

Also included is any other mental condition which requires **Medically Necessary** treatment.

**Physician**
A duly licensed member of a profession who:

- Has an M.D. or D.O. degree;
- Is properly licensed or certified to provide medical care under the laws of the jurisdiction where the individual practices; and
- Provides medical services which are within the scope of his or her license or certificate.

This also includes a health professional who:

- Is properly licensed or certified to provide medical care under the laws of the jurisdiction where he or she practices;
- Provides medical services which are within the scope of his or her license or certificate;
- Under applicable insurance law is considered a "physician" for purposes of this coverage;

- Has the medical training and clinical expertise suitable to treat your condition;
- Specializes in psychiatry, if your **illness** or **injury** is caused, to any extent, by alcohol abuse, substance abuse or a mental disorder; and
- A physician is not you or related to you.

**Precertification or Precertify**
A process where Aetna is contacted before certain services are provided, such as **hospitalization** or outpatient surgery, or **prescription drugs** are prescribed to determine whether the services being recommended or the drugs prescribed are considered **covered expenses** under the plan. It is not a guarantee that benefits will be payable.

**Residential Treatment Facility (Mental Disorders)**
This is an institution that meets all of the following requirements:

- On-site licensed **Behavioral Health Provider** 24 hours per day/7 days a week.
- Provides a comprehensive patient assessment (preferably before admission, but at least upon admission).
- Is admitted by a **Physician**.
- Has access to necessary medical services 24 hours per day/7 days a week.
- Provides living arrangements that foster community living and peer interaction that are consistent with developmental needs.
- Offers group therapy sessions with at least an RN or Masters-Level Health Professional.
- Has the ability to involve family/support systems in therapy (required for children and adolescents; encouraged for adults).
- Provides access to at least weekly sessions with a **Psychiatrist** or psychologist for individual psychotherapy.
- Has peer oriented activities.
- Services are managed by a licensed **Behavioral Health Provider** who, while not needing to be individually contracted, needs to (1) meet the **Aetna** credentialing criteria as an individual practitioner, and (2) function under the direction/supervision of a licensed psychiatrist (Medical Director).
- Has individualized active treatment plan directed toward the alleviation of the impairment that caused the admission.
- Provides a level of skilled intervention consistent with patient risk.
- Meets any and all applicable licensing standards established by the jurisdiction in which it is located.
- Is not a Wilderness Treatment Program or any such related or similar program, school and/or education service.

**Stay**
A full-time inpatient confinement for which a **room and board** charge is made.

Ex. A, at 76-91.

**STATEMENT OF FACTS**

8

12. Plaintiff has been diagnosed with multiple neurodevelopmental disorders, specifically attention and learning disorders, which are recognized mental health conditions encompassed within the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V"), and also applicable federal and state law, specifically the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") (29 U.S.C. § 1185a) and Illinois law on "Mental and Emotional Disorders" (215 ILCS 5/370c) (collectively "Parity Laws").

13. Plaintiff was first prescribed medication for his psychiatric condition at the age of only six, which included various stimulants and lithium.

14. On April 21 and 22, 2011, at the age of only nine, Plaintiff underwent a neuropsychological evaluation performed by child and adolescent neuropsychologist, Karen Rottier, Ph.D. Plaintiff was diagnosed with attention deficit hyperactivity disorder ("ADHD") and a learning disorder with impairment in written expression.

15. A follow-up neuropsychological evaluation was performed by Dr. Rottier approximately three and a half years later, on January 20, 2015, after which Plaintiff's prior diagnoses were confirmed with the addition of learning disorders with impairments in reading and mathematics.

16. Around that time, Plaintiff also received outpatient treatment from child and adolescent psychiatrists, Karen Stoller, M.D. and David Hirsch, M.D.

17. Nonetheless, Plaintiff's struggles on account of his neurodevelopmental disorders and other mental health impairments continued, and he was eventually admitted to Elements Wilderness Program ("Elements") on June 14, 2016. A detailed treatment plan was designed by

9

therapist, Robb Rossi, L.C.S.W. Plaintiff's admission diagnoses were ADHD; anxiety disorder; and learning disorders with impairments in reading, written expression, and mathematics.

18. Elements is an all-boy outdoor residential treatment program located in in Huntington, Utah and licensed by the State of Utah. Elements' staff includes multiple psychologists, a medical director, a psychiatric nurse practitioner, and over half a dozen therapists.

19. Shortly after being admitted to Elements, and at the recommendation of the Elements' clinical staff, a comprehensive neuropsychological evaluation was performed by neuropsychologist, Sharelle Baldwin, Ph.D., on July 5, 2016. The evaluation was conducted "for diagnostic clarification, to assess for neurocognitive strengths and weaknesses, and to provide intervention and treatment recommendations."

20. The results of Plaintiff's July 5, 2016 neuropsychological evaluation were deemed valid, and "highly consistent" with the prior testing administered in January 2015 "in relation to intellectual and academic functioning." It was further noted that "[o]n measures of emotional, personality, and interpersonal functioning, [Plaintiff] scored high on measures of desirability, dramatizing, unruly, social insensitivity, and delinquent predisposition." The diagnostic formulation was ADHD and learning disorders with impairments in reading, written expression, and mathematics; and the therapeutic recommendation was as follows:

> Given the pervasive history of [Plaintiff]'s developmental issues, and behavioral concerns, it is recommended that he obtain services in a residential treatment center or a therapeutic boarding school. [Plaintiff] will require a 24-hour residential setting and consistent structure to ensure the appropriate amount of intervention for his social and emotional needs to ensure his academic progress. A review of previous [individualized educational programs] appear to have attempted to address [Plaintiff]'s social and emotional needs; however, it appears as though [Plaintiff]'s needs surpassed many of the interventions to the extent that he now requires a residential or therapeutic boarding school placement.

21. Plaintiff was discharged from Elements on August 21, 2016, at which time the diagnostic impression was ADHD; learning disorders with impairments in reading, written expression, and mathematics; parent-child relational problems; and generalized anxiety disorder. Therapist Rossi documented that "[d]uring his time at Elements, [Plaintiff] vacillated in his willingness to follow through with potentially useful tools[,] and needed significant redirection and support to learn or practice tools," so it was "important for [Plaintiff] to be in [a] setting that understands his particular struggles and helps him to continue learning and practicing tools to manage his ADHD." Therapist Rossi further documented that Plaintiff "showed difficulty in implementing strategies for coping with anxiety and emotional dysregulation, but was able to use skills with support from peers and staff;" and "will need continued treatment to effectively regulate emotions as the skills and gains made in wilderness are tenuous without ongoing practice and support."

22. The below recommendation was made by Therapist Rossi upon Plaintiff's discharge from Elements:

> Following Elements, [Plaintiff] would benefit most from placement in a residential treatment program. Outside of a structured and supportive treatment environment, [Plaintiff] will return to previous issues with depression, withdrawal, oppositionality, struggles with relationship, and struggle in school which led to his placement in wilderness therapy. This level of care is also recommended as a result of poor response to previous less restrictive treatment efforts. [Plaintiff] will benefit from a setting where there is a peer driven milieu and he will receive support daily from peers, therapist and other members of the treatment team.

23. Accordingly, Plaintiff was admitted to Catalyst Residential Treatment Center ("Catalyst") on August 21, 2016 immediately after being discharged from Elements.

24. Catalyst is another all-boy residential treatment program located in Brigham City, Utah, and is also licensed by the State of Utah.

25. Shortly after being admitted to Catalyst, Plaintiff underwent a psychiatric evaluation performed by the medical director, Blake Petrick, P.M.H.N.P.-B.C., an advanced practice psychiatric mental health nurse practitioner. The diagnostic impression was ADHD; learning disorders with impairments in reading, written expression, and mathematics; oppositional defiant disorder; and generalized anxiety disorder. It was recommended that Plaintiff continue with his then-current medications, which included a stimulant, a selective serotonin reuptake inhibitor ("SSRI"), and anti-psychotic mediations. The medical director also documented the following treatment instructions:

> I would recommend this program as part of the aftercare recommendation from the wilderness program. He will benefit from the academic program and suggestions and recommendations in the psychoeducational evaluation. As far as I believe he will benefit fully if he is willing t[o] engage in the individual, family, group, and recreational therapy offered here at Catalyst.

26. On September 26, 2016, a detailed treatment plan was made by marriage and family therapist, Blake Altom, L.M.F.T., who also recommended medication management and individual, family, and group therapy. Plaintiff was eventually discharged from Catalyst on August 17, 2017.

27. After being discharged from Catalyst, Plaintiff resumed outpatient mental health treatment. Plaintiff was also enrolled at Kents Hill School, a boarding school in Kents Hill, Maine, but had to be moved to a therapeutic boarding school in Costa Rica due to continued struggles resulting from his neurodevelopmental and other mental health disorders.

**COUNT I –**
**CLAIM FOR BENEFITS RELATING TO PLAINTIFF'S TREATMENT AT ELEMENTS**

In regard to Count I of his Complaint, Plaintiff reasserts and incorporates paragraphs 1-27 above as though fully set forth herein and further alleges as follows:

28. After being told that pre-authorization was not required, Plaintiff submitted a claim for coverage under the Plan for the mental health treatment he received at Elements from June 14, 2016 until he was discharged on August 21, 2016.

29. On October 18, 2016, Aetna issued an explanation of benefits ("EOB") denying coverage for some of the "medical services" rendered at Elements. In support thereof, the EOB stated that "[y]our plan pays for charges we find to be reasonable and appropriate. We will not pay for this service. This is because it exceeds the number of times covered in a single day."

30. On December 16 and 23, 2016, Aetna issued two more EOBs indicating that none of the charges incurred from Plaintiff's treatment at Elements were payable under the Plan. In support thereof, the EOBs claimed that "[t]he provider did not notify us in time about this inpatient stay;" and the Plan "requires precertification for this service. We have no record of precertification."

31. On January 11, 2017, Plaintiff requested a "post-service review" of his claims for coverage of the mental health treatment he received at Elements from June 14, 2016 to August 21, 2016; and submitted a complete copy of his medical records from Elements to Aetna.

32. On June 9, 2017, Plaintiff also appealed Aetna's denial of coverage for the mental health treatment he received at Elements; and again submitted a complete copy of his medical records from Elements to Aetna.

33. In a letter dated June 12, 2017, Aetna issued a decision upholding its denial of coverage, alleging that "[y]our plan requires precertification for this service. We have no record of precertification…The provider did not notify us in time about this inpatient stay."

34. On November 16, 2017, Plaintiff submitted a second appeal to Aetna, but Aetna refused to consider it in a letter dated December 20, 2017 on the basis that it was untimely, making Aetna's original benefit determination final.

35. All required pre-litigation appeals seeking payment of the outdoor residential mental health treatment Plaintiff received while admitted at Elements have now been exhausted pursuant to ERISA § 503 (29 U.S.C. § 1133). Therefore, this matter is ripe for judicial review.

36. Contrary to the reasons asserted by Aetna, the services at issue, i.e., the residential mental health treatment Plaintiff received while admitted at Elements between June 14, 2016 and August 21, 2016 should have been covered under the Plan. Although not articulated by Aetna as a reason for denying coverage, to the extent the Plan excludes "Wilderness Treatment Programs," that exclusion does not apply here because Elements otherwise meets the Plan's "Residential Treatment Facility" definition. Moreover, any such exclusion violates the applicable Parity Laws, which require that the Plan cover mental health treatment on the same terms, at the same rates, and for the same duration of time that apply to comparable medical or surgical healthcare benefits.

37. Plaintiff and his family have improperly incurred unreimbursed charges for his mental health treatment at Elements in the total approximate amount of $35,000.00 that should have been covered and/or reimbursed under the Plan. Accordingly, Plaintiff is entitled to benefits under the Plan for that treatment pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)).

**COUNT II –
CLAIM FOR BENEFITS RELATING TO PLAINTIFF'S TREATMENT AT CATALYST**

In regard to Count II of his Complaint, Plaintiff reasserts and incorporates paragraphs 1-27 above as though fully set forth herein and further alleges as follows:

38. After being unable to submit a pre-authorization claim, Plaintiff submitted a timely claim for coverage under the Plan for the mental health treatment he received at Catalyst from August 21, 2016 until he was discharged on August 17, 2017.

39. In a letter dated August 25, 2016, Aetna notified Plaintiff that it was denying his claim "because we have not been able to obtain any requested clinical information from the provider to determine whether or not the services are considered medically necessary under the terms of the plan."

40. Less than a week later, in a letter dated August 30, 2016, Aetna again notified Plaintiff that it was denying his claim for the mental health treatment he was receiving at Catalyst, but on a different basis. In support thereof, Aetna stated as follows:

> Case is administratively denied as not a covered service. The following specific out-of-network Residential Treatment Center criteria or provisions were not met: (1) Is accredited by one of the following agencies, commissions or committees for the services being provided: The Joint Commission (TJC), Committee on Accreditation of Rehabilitation Facilities (CARF), American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP) or the Council on Accreditation (COA), or is credentialed by Aetna; (2) The patient is treated by a psychiatrist at least once per week; (3) Provides treatment services that are managed by a behavioral health provider who functions under the direction/supervision of a medical director.

Importantly, none of that criterion was included in the Plan produced to Plaintiff during the claim process and which is attached hereto as Exhibit A.

41. On February 14, 2017, Plaintiff appealed Aetna's denial of coverage for the mental health treatment he received at Catalyst from August 21, 2016 onward.

42. In a letter dated March 20, 2017, Aetna upheld its decision to deny coverage. In support thereof, Aetna explained as follows:

> Please understand that this determination is strictly based on your plan benefit limitation, and is not a determination of medical necessity.

> Treatment in principle could be approved but a review of clinical material would be needed to document that coverage is medically necessary. Insufficient clinical material was submitted to make a determination. There is no intake evaluation, discharge summary, treatment plan, or aftercare plan. There are no progress notes or nursing of physician notes. There is no information upon which to make a determination of the medical necessity of the services provided. This decision was made utilizing the SPD for Fox Entertainment Group, LLC. You may obtain a copy of these criteria.
>
> This denial of coverage is based solely upon the reasons set forth above. No other basis for exclusion (e.g., medical necessity of the service or supply) that may be applicable to the circumstances was evaluated at this time.
>
> Please refer to the SPD for Fox Entertainment Group, LLC[] in the section titled **"Treatment of Mental Disorders and Substance Abuse"** which states in part, "Not all types of services are covered. For example, educational services and certain types of therapies are not covered. Benefits are payable for charges incurred in a hospital, psychiatric hospital, residential treatment facility or behavioral health provider's office for the treatment of mental disorders or for the treatment of substance abuse, treatment must be precertified by Aetna."
>
> An Aetna medical director, board certified in adult psychiatry and child and adolescent psychiatry, a behavioral health project coordinator, and a complaint and appeal analyst who were not involved in the original decision, participated in the review of this appeal.

43. Accordingly, on April 18, 2017, Plaintiff responded to Aetna's March 20, 2017 letter by producing a complete copy of his medical records from Catalyst, so Aetna could "determine that the treatment [] received from Catalyst is medically necessary."

44. Nonetheless, in a letter dated May 25, 2017, Aetna upheld its denial of coverage, claiming that "[y]our plan requires precertification for this service. We have no record of precertification…The provider did not notify us in time about this inpatient stay." Aetna's letter further stated as follows:

> Under the plan, benefits are not available for out-of-network residential programs unless (among other requirements) they are staffed 24/7 by licensed clinicians, and patients are admitted by physicians. The member was admitted to this program with a staffing pattern inconsistent with the contract requirements. There is therefore no coverage. The member may refer to their Certificate of Coverage or Member Handbook for specific details regarding their health care benefit coverage.

16

>This denial of coverage is based solely upon the reasons set forth above. No other basis for exclusion (e.g., medical necessity of the service or supply) that may be applicable to the circumstances was evaluated at this time.
>
>Please refer to your SPD, in part, entitled **"Treatment of Mental Disorders and Substance Abuse."**
>
>"Not all types of services are covered. For example, educational services and certain types of therapies are not covered. Benefits are payable for charges incurred in a hospital, psychiatric hospital, residential treatment facility or behavioral health provider's office for the treatment of mental disorders or for the treatment of substance abuse, treatment must be precertified by Aetna."
>
>Please also refer to your SPD, in part, entitled **"Gloss[a]ry"**
>
>"Precertification or Precertify
>A process where Aetna is contacted before certain services are provided, such as hospitalization or outpatient surgery, or prescription drugs are prescribed to determine whether the services being recommended or the drugs prescribed are considered covered expenses under the plan. It is not a guarantee that benefits will be payable."
>
>A medical director, board certified in general psychiatry, also certified by ASAM Addiction Medicine, a complaint and appeal nurse and a complaint and appeal analyst, who were not involved in any prior reviews, participated in the review of the appeal, including all supporting documentation submitted to date.

45. All required pre-litigation appeals seeking coverage of the mental health treatment Plaintiff received while admitted at Catalyst have now been exhausted pursuant to ERISA § 503 (29 U.S.C. § 1133). Therefore, this matter is ripe for judicial review.

46. Contrary to the reasons asserted by Aetna, the services at issue, i.e., the residential mental health treatment Plaintiff received while admitted at Catalyst from August 21, 2016 to August 17, 2017, were medically necessary and should have been covered under the Plan. To the extent Plaintiff's treatment had been covered under the Plan, but at a lesser rate or for a shorter period of time than comparable medical or surgical healthcare benefits, Defendants violated the applicable Parity Laws.

47. Plaintiff and his family have improperly incurred unreimbursed charges for his mental health treatment at Catalyst in the total approximate amount of $120,000.00 that should have been covered and/or reimbursed under the Plan. Accordingly, Plaintiff is entitled to benefits under the Plan for that treatment pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)).

## COUNT III –
## CLAIM FOR BREACH OF FIDUCIARY DUTY

In regard to Count III of his Complaint, Plaintiff reasserts and incorporates paragraphs 1-47 above as though fully set forth herein and further alleges as follows:

48. As an ERISA fiduciary, Aetna was obligated to administer the Plan "solely in the interest of the participants and beneficiaries and…in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of" ERISA. ERISA § 404(a)(1)(D) (29 U.S.C. § 1132(a)(1)(D)).

49. Throughout its administration of Plaintiff's claim for coverage of the mental health treatment he received while admitted at Elements and Catalyst, Aetna failed to meet those fiduciary obligations under ERISA by citing coverage criterion in its denial letters that is not even included in the Plan. See also 29 C.F.R. §§ 2560.503-1(g)(1)(ii) & (j)(2). Aetna also failed to provide Plaintiff with a "full and fair review" as required by ERISA § 503 (29 U.S.C. § 1133) and 29 C.F.R. § 2560.503-1 by citing changing denial rationales even after submission of Plaintiff's appeals. Accordingly, Plaintiff is entitled to other appropriate equitable relief for Aetna's breach of fiduciary duty in administering his healthcare benefits claims pursuant to ERISA § 503 (29 U.S.C. § 1132(a)(3)).

## RELIEF SOUGHT

WHEREFORE, Plaintiff prays for the following relief:

18

      A.      That the Court enter judgment in Plaintiff's favor and against Defendants, and order Defendants to reimburse Plaintiff in an amount equal to the contractual amount of health benefits to which Plaintiff is entitled, i.e., for the approximately $155,000.00 in total charges incurred for his treatment at Elements and Catalyst that should have been covered under the Plan;

      B.      That the Court order Defendants to pay Plaintiff prejudgment interest on all past due health benefits that have accrued prior to the date of judgment;

      C.      That the Court award Plaintiff the reasonable attorneys' fees and costs incurred in this suit pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g)); and

      D.      That the Court award Plaintiff any and all other appropriate penalties, damages, and equitable relief to which Plaintiff may be entitled.

Dated: October 24, 2018

Respectfully submitted,

/s/ Marie E. Casciari
_____
Marie E. Casciari
One of the Attorneys for Plaintiff
I.P. o/b/o D.S.

Marie E. Casciari
Mark D. DeBofsky
DeBofsky, Sherman & Casciari, P.C.
200 West Madison Street, Suite 2670
Chicago, Illinois 60606
Voice (312) 561-4040
Fax (312) 929-0309
Email mdebofsky@debofsky.com
Email mcasciari@debofsky.com